**KELLEY DRYE & WARREN LLP**
Rebecca B. Durrant (State Bar No. 350444)
rdurrant@kelleydrye.com
Glenn T. Graham (State Bar No. 338995)
ggraham@kelleydrye.com
888 Prospect Street, Suite 200
La Jolla, CA 92037
Tel.: (212) 808-7551
Fax: (212) 808-7897

*Attorneys for Amicus Curiae*
*Retail Litigation Center*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARCO WALSH, HOWARD YOSHA, and ERICA MALDONADO, as individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DOLLAR TREE STORES, INC.,<br><br>Defendant. | Case No. 5:25-cv-01601-SVK<br><br>**BRIEF OF *AMICUS CURIAE* THE RETAIL LITIGATION CENTER IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**<br><br>Hearing Date: July 29, 2025<br><br>Hearing Time: 10 a.m.<br><br>Judge: Hon. Judge Susan van Keulen<br><br>Complaint filed: February 14, 2025 |

**TABLE OF CONTENTS**

**Page**

STATEMENT OF INTEREST....1
PRELIMINARY STATEMENT....2
ARGUMENT....3
I. CIPA Was Enacted to Prevent Industrial Espionage, Not to Police Business-to-Consumer Communications....3
II. Repeat Players Bring Substantially Identical CIPA Claims Against Large Numbers of Defendants....6
CONCLUSION....10

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Byars v. Hot Topic, Inc.*,
656 F. Supp. 3d 1051 (C.D. Cal. 2023) ....................5, 7, 8

*Casillas v. Transitions Optical, Inc.*,
No. 23STCV30742, 2024 WL 4873370 (Cal. Super. Ct. L.A. Cnty Sept. 9, 2024)....................5

*Flanagan v. Flanagan*,
27 Cal. 4th 766 (2002) ....................4

*In re Google Inc.*,
No. 5:13-md-02430, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ....................5

*Gutierrez v. Converse, Inc.*,
No. 2:23-cv-06547, 2024 WL 3511648 (C.D. Cal. Jul. 12, 2024) ....................4

*Heredia v. W. Valley Staffing Grp.*,
No. 5:16-cv-06777, 2017 WL 766720 (N.D. Cal. Feb. 28, 2017)....................6

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002) ....................5

*Javier v. Assurance IQ*,
No. 21-16351, 2022 WL 1744107 (9th Cir. May 31, 2022)....................4

*Licea v. Cinmar, LLC*,
659 F. Supp. 3d 1096 (C.D. Cal. 2023) ....................4

*Montera v. Premier Nutrition Corp.*,
111 F.4th 1018 (9th Cir. 2024)....................3

*R.C. v. Sussex Publishers, LLC*,
No. 3:24-cv-02609, 2025 WL 948060 (N.D. Cal. Mar. 28, 2025) ....................4

*Smith v. LoanMe, Inc.*,
11 Cal. 5th 183 (2021) ....................3

*Valenzuela v. Keurig Green Mountain, Inc.*,
674 F. Supp. 3d 751 (N.D.Cal. 2023) ....................4

**Statutes and Other Authorities**

Cal. Civ. Code § 1798.100....................5

Cal. Civ. Code § 1798.150....................6

Cal. Civ. Code § 1798.155 ......................................................................................................6

Crimes: Intercepting Telephone Communications,
2022 Cal. Legis. Serv. Ch. 27 (S.B. 1272) ..................................................................4

The Retail Litigation Center respectfully submits this brief in support of Defendant Dollar Tree Stores, Inc.'s motion to dismiss the Class Action Complaint of Plaintiffs Marco Walsh, Howard Yosha, and Erica Maldonado.

**STATEMENT OF INTEREST**

The Retail Litigation Center (the "RLC") is a 501(c)(6) nonprofit trade association that represents national and regional retailers, including many of the country's largest and most innovative retailers, across a breadth of retail verticals. The RLC is the only trade organization solely dedicated to representing the retail industry in the courts. The RLC's members employ millions of people throughout the U.S., provide goods and services to tens of millions more, and account for tens of billions of dollars in annual sales. The RLC offers retail-industry perspectives to courts on important legal issues and highlights the industry-wide consequences of significant cases. Since its founding in 2010, the RLC has filed more than 250 amicus briefs on issues of importance to the retail industry. Its amicus briefs have been helpful to courts throughout the United States, as evidenced by citation to the RLC amicus briefs in numerous precedential opinions. *See, e.g.*, *South Dakota v. Wayfair, Inc*., 585 U.S. 162, 184 (2018); *Kirtsaeng v. John Wiley & Sons, Inc*., 568 U.S. 519, 542 (2013); *Chewy, Inc. v. U.S. Dep't of Lab*., 69 F.4th 773, 777–78 (11th Cir. 2023); *State v. Welch*, 595 S.W.3d 615, 630 (Tenn. 2020).

Many of the RLC's members—and hundreds of businesses large and small—have been sued under Cal. Pen. Code § 630 *et seq.*, known as the California Invasion of Privacy Act ("CIPA"), because commonly used online website maintenance and customer service tools appear on their sites. Many more have received demand letters insisting on settlement payments if the member wanted to avoid the cost of defending a class action lawsuit based on the same legal theory. The RLC's members thus have a substantial interest in the outcome of actions, like this one, that implicate CIPA.

## PRELIMINARY STATEMENT

When the California Legislature passed CIPA in 1967, it had a narrow, but critical purpose: to stem the tide of Cold War-era corporate espionage threatening California businesses' trade secrets. The Legislature said so when it passed the bill, and it designed CIPA's enhanced statutory penalties to address the concern that lesser sanctions would not deter the business advantage to be gained from corporate theft. In the half-century following CIPA's enactment, the Legislature amended CIPA to address key technological developments—like the advent of the mobile phone—but never the internet. Rather, California has addressed web-based data through purpose-built tools, like the California Consumer Privacy Act ("CCPA").

Still, a small number of plaintiffs' firms seek to place a square peg into a round hole, filing a wave of CIPA suits—well over one a day—alleging improper collection of online data. The complaints change little from case to case: one judge has called them "cookie cutter" filings, and two lawmakers have remarked that the suits are "abusive" and serve no purpose beyond generating fees for the firms that file them. And courts do not see the full CIPA picture. Whereas over 750 CIPA cases have been filed since January 1, 2024, many times that number have been threatened or filed as private arbitrations. The companies that receive these CIPA demands face an impossible decision: spend enormous sums to fight; or acquiesce and pay a settlement ransom, which will only embolden and enable these firms to demand payment from other businesses.

Courts thus play a crucial gatekeeping role in CIPA actions at the pleading stage. After stripping away the boilerplate allegations, which are present in this case and hundreds of others, the Court should carefully scrutinize the facts presented and find that they do not state a claim under CIPA.

## ARGUMENT

### I. CIPA WAS ENACTED TO PREVENT INDUSTRIAL ESPIONAGE, NOT TO POLICE BUSINESS-TO-CONSUMER COMMUNICATIONS

CIPA was enacted decades before the internet was created, and for reasons wholly unrelated to the current theories advanced by a small set of class action attorneys. CIPA was enacted in the 1960s "to put a stop to unethical industrial espionage and spying operations in California." *See* Decl. of Rebecca B. Durrant ("Durrant Decl.") Ex. A (Press Release from Assembly Speaker Jesse M. Unruh (Mar. 1, 1967)).[1] Without CIPA, Assemblyman Unruh and the California Legislature reasoned that "the businessman [would be] unable to develop new products without fear of having these developments discovered by a competitor through illegal means." *Id.*; *see also* Durrant Decl. Ex. B (Statement of Assembly Speaker Jesse M. Unruh Relative to Assembly Bill 860, at 2 (Mar. 14, 1967) ("This is an especially serious problem today in view of increased industrial spying and the theft of trade secrets by competitors.")). Indeed, CIPA was specifically intended not to interfere with the recording of calls by businesses in their dealings with consumers. *See* Durrant Decl. Ex. C (Letter dated June 30, 1967 from Assembly Speaker Jesse M. Unruh to Charles L. Gould, Publisher of the San Francisco Examiner (stating that it would "continue to be perfectly legal to monitor business calls" made by consumers "to ensure proper service")).

Deterring industrial espionage was also the reason for CIPA's statutory damage scheme. "The type of individual or business enterprise which often eavesdrops for the purpose of obtaining trade secrets is unimpressed with the present very small financial penalties for such violations." Durrant Decl. Ex. D (Statement of Assembly Speaker Jesse M. Unruh before the Senate Committee on Judiciary on Assembly Bill 860 Relating to Invasions of Privacy, at 3–4 (June 8, 1967)).

---

[1] "Legislative history is properly a subject of judicial notice." *Montera v. Premier Nutrition Corp.*, 111 F.4th 1018, 1040 n.11 (9th Cir. 2024) (quoting *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012)). The RLC respectfully requests that the Court take notice of the legislative history materials cited in this section.

Statutory damages directly addressed the concern that, "[i]n such cases, the possible economic rewards might be so great that they would outweigh the threat of criminal penalties." Durrant Decl. Ex. B (Statement of Jesse M. Unruh relative to Assembly Bill 860 (Mar. 14, 1967)).

In present-day CIPA litigation, plaintiffs endeavor to extend the decades-old law to modern technology. But the internet did not exist when legislators drafted the law, nor was it even contemplated. The Legislature has had decades to consider the internet and has declined to amend CIPA to address it. *See Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 191 (2021) (noting that the California Legislature has amended the law "from time to time in response to the emergence of new communication devices"). The Legislature knows how to amend CIPA to account for new technology: it passed the Cellular Radio Telephone Privacy Act to address "the advent of widespread use of cellular radio telephone technology," because "persons will be conversing over a network which cannot guarantee privacy in the same way that it is guaranteed over landline system." *Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002) (internal quotes omitted). Yet, while it has amended CIPA multiple times since the advent of the internet, including most recently in 2022, *see* Crimes: Intercepting Telephone Communications, 2022 Cal. Legis. Serv. Ch. 27 (S.B. 1272), none of those amendments has ever expanded its wiretapping provisions such as Sections 631 and 638.51 to include web-based practices. *See, e.g.*, *Licea v. Cinmar*, *LLC*, 659 F. Supp. 3d 1096, 1106 (C.D. Cal. 2023) (describing CIPA legislative history and concluding "the Legislature amended the California Invasion of Privacy Act many times since it was enacted and have not redefined section 631 to apply to internet communications.").

In other words, CIPA's Section 631(a), which Plaintiffs rely on in this case, does not apply to the internet tools that are so often targeted by plaintiffs. The first clause, by its plain language, does not apply to the internet. *See Gutierrez v. Converse Inc.*, No. 2:23-cv-06547, 2024 WL 3511648, at *7 (C.D. Cal. July 12, 2024) ("Courts have consistently interpreted this clause as applying only to communications over telephones and not through the internet." (quoting *Licea*,

659 F. Supp. 3d at 1104)), *appeal docketed*, No. 24-4797 (9th Cir.)[2]; *Valenzuela v. Keurig Green Mountain, Inc.*, 674 F. Supp. 3d 751, 755–56 (N.D. Cal. 2023) (finding that the first clause—by its plain terms—does not apply to technologies other than telegraphs and telephones). And the second clause, requiring the third party to learn the contents of communication "in transit," is similarly inapplicable to Internet tools. *E.g.*, *Gutierrez*, 2024 WL 3511648, at *7 (granting summary judgment because transmission of message through a third-party server does not necessitate an interception "in transit" as is required); *R.C. v. Sussex Publishers, LLC*, No. 3:24-cv-02609, 2025 WL 948060, at *7 (N.D. Cal. Mar. 28, 2025) (granting motion to dismiss because even if Google's pixel tool could analyze data, it did not do so "while the same was in transit"); *see also Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 874 (9th Cir. 2002) (finding that CIPA's federal counterpart "is ill-suited to address modern forms of communication"). The challenged online software tools differ from the telephone or telegraph communications covered by the provision's plain text. Section 638.51, the pen register provision of CIPA also invoked by Plaintiffs, likewise "did not, and does not, criminalize the process by which all websites communicate with all users who choose to access them." *Casillas v. Transitions Optical, Inc.*, No. 23STCV30742, 2024 WL 4873370, at *4 (Cal. Super. Ct. L.A. Cnty. Sept. 9, 2024). If anything, online browsing is much more like "a facsimile or text transmission" than it is a phone call, for which courts have held that "recordation may be expected" under Section 632 of CIPA. *Smith*, 11 Cal. 5th at 194 n.4; *see also In re Google Inc.*, No. 5:13-md-02430, 2013 WL 5423918, at *22 (N.D. Cal. Sept. 26, 2013). Recognizing the differences between online activity and phone calls, California enacted independent laws to address individuals' rights in certain data online. The

[2] The district court's opinion in *Gutierrez* is currently pending before the Ninth Circuit and has been noticed for oral argument on June 10, 2025. No. 24-4797, ECF No. 54 (9th Cir. May 2, 2025). Given the issues before the Ninth Circuit, this appeal presents an opportunity for the Ninth Circuit to clarify the scope of its unpublished decision in *Javier v. Assurance IQ*, No. 21-16351, 2022 WL 1744107 (9th Cir. May 31, 2022), which "appears to have opened the floodgates for these [copy-paste CIPA] cases, an unfortunate unintended consequence of a brief, narrow ruling limited to the issue of prior consent." *Byars v. Hot Topic, Inc.*, 656 F. Supp. 3d 1051, 1060 n.6 (C.D. Cal. 2023).

California Consumer Privacy Act ("CCPA"), for example, specifically addresses businesses' "duties" as to "a consumer's personal information." Cal. Civ. Code § 1798.100. Government and private industry alike recognize that the way data has historically been handled on the internet contributed to its growth and innovation:

> The free flow of data online enables the continued economic success of the Internet, creating substantial consumer benefit. Online data-driven advertising has powered the growth of the Internet for decades by funding innovative tools and services for consumers and businesses to use to connect and communicate. Data-driven advertising supports and subsidizes the online content and services consumers expect and rely on, including video, news, music, and much more, at little or no cost to the consumer. Companies also collect data for various operational purposes, such as ad delivery and reporting, fraud prevention, network enhancement, and customization. These uses are necessary for a seamless cross-channel, cross-device consumer experience and a functioning digital economy.

Cal. Dep't of Justice., Interactive Advertising Bureau, Comment Letter on Proposed California Consumer Privacy Act (Mar. 8, 2019), ***available at*** https://oag.ca.gov/sites/all/files/agweb/pdfs/privacy/ccpa-public-comments.pdf, at PDF p. 460 (last visited May 5, 2025). Thus, the CCPA provides a private right of action only as to a far narrower subset of personal information that is stolen or disclosed due to a failure to implement reasonable security measures, and only after the consumer provides the business 30 days to explore the possibility of cure. Cal. Civ. Code § 1798.150. The law provides for no treble damages, *id.*, and the majority of CCPA enforcement is in the sole province of the California Attorney General, *see* Cal. Civ. Code § 1798.155. California has spoken on the appropriate regulatory scheme for online internet activity—forcing online data into CIPA ignores this careful balance.

## II. REPEAT PLAYERS BRING SUBSTANTIALLY IDENTICAL CIPA CLAIMS AGAINST LARGE NUMBERS OF DEFENDANTS

In recent years, a small number of law firms have filed large volumes of claims seeking to shoehorn the treatment of internet data into CIPA. Together, these firms have created a new litigation enterprise. That context is important in courts' assessment of CIPA claims, like those at issue here.

Specifically, since January 2024, the RLC is aware of 784 newly filed cases alleging violations of CIPA, nearly all of which have been filed in California courts. *See* Durrant Decl. Ex. E (Chart of Claims).[3] Just five law firms filed 716 of them: Pacific Trial Attorneys (462 cases); Tauler Smith (92 cases); Brodsky Smith (82 cases); Bursor & Fisher (44 cases); and the Law Offices of Todd M. Friedman (36 cases). *Id.* These firms tend to bring many cases on behalf of the same named plaintiffs. As one example, Militia Casillas has served as lead plaintiff in 72 cases. *Id.* The incentive for filing lies in the $5,000 in statutory damages that can be awarded per violation, multiplied by the potentially large group of consumers that may access a retailer's website. Plaintiffs use the high statutory damages figure as leverage to extract nuisance-value settlements from defendants. And defendants frequently comply, because defending a CIPA action is expensive and makes no guarantee that others will not follow. Many defendants have faced multiple CIPA suits since January 2024. *See, e.g.*, Autotrader.com (in *Rodriguez v. Autotrader.com, Inc.*, No. 24STCV13149 (Cal. Super. Ct. L.A. Cnty. May 24, 2024) and *Kishnani v. Autotrader.com, Inc.*, No. 24STCV22440 (Cal. Super. Ct. L.A. Cnty. Sept. 3, 2024)), Marriott International (in *Sanchez v. Marriott Int'l,* No. 24STCV11227 (Cal. Cal. Super. Ct. L.A. Cnty. May 3, 2024) and *O'Connell v. Marriott Int'l*, No. 2:25-cv-1661 (C.D. Cal. Feb. 26, 2025)), and Patagonia (in *Valenzuela v. Patagonia, Inc.*, No. 24STCV14641 (Cal. Super. Ct. L.A. Cnty. June 12, 2024) and *Moore v. Patagonia, Inc.*, No. 24STCV16713 (Cal. Super. Ct. L.A. Cnty. July 3, 2024)).

The firms filing these suits rely on templated pleadings designed to apply to numerous defendants with minimal changes. While drafting "legitimate" complaints "generally requires a considerable expenditure of time," it is "far easier and cheaper to copy and paste a complaint over

---

[3] "[T]he Court may take judicial notice of records from other proceedings not to credit the truth of the allegations or facts set forth therein, but rather for purposes of noticing the existence of the prior law-suit[s], the claims made in the lawsuit[s], and the fact that various documents were filed therein." *Heredia v. W. Valley Staffing Grp.*, No. 5:16-cv-06777, 2017 WL 766720, at *2 (N.D. Cal. Feb. 28, 2017) (quoting *Acasio v. San Mateo Cnty.*, No. 3:14-cv-04689, 2015 WL 5568345, at *1, n.1 (N.D. Cal. Sep. 22, 2015))

and over again, and to write the original template in such a way that hardly anything needs to be swapped out." *Byars v. Hot Topic, Inc.*, 656 F. Supp. 3d 1051, 1060 (C.D. Cal. 2023). The firm prosecuting this case recently filed substantially similar complaints on behalf of the same plaintiff against different defendants with the exact same typographic errors. *Compare* Compl., ECF No. 1, *Gabrielli v. Motorola Mobility LLC*, No. 4:24-cv-9533 (N.D. Cal. Dec. 31, 2024), at 28 ("The Private Communications Collected is Valuable."), *with* Compl., ECF No. 1, *Gabrielli v. Upbound Group, Inc.*, No. 4:25-cv-0631 (N.D. Cal. Jan. 17, 2025), at 44 (same). Firms even file complaints nearly identical to those of other firms, with three firms filing essentially the same allegations against various defendants arising out of the "TikTok pixel." *Compare generally* Class Action Compl., *Esparza v. Speer Labs., LLC*, No. 25STCV10006 (Cal. Super. Ct. L.A. Cnty. Apr. 4, 2025) (Law Offices of Todd M. Friedman), *with* Compl., *Casillas v. Trader Vic's*, No. 25STCV07311 (Cal. Super. Ct. L.A. Cnty. Mar. 14, 2025) (Pacific Trial Attorneys), *and with* Compl., *Schallert v. Scality, Inc.*, No. 25STCV07680 (Cal. Super. Ct. L.A. Cnty. Mar. 17, 2025) (Tauler Smith). Many complaints isolate a single purported non-compliant action, which is often the use of third-party tools that plaintiffs allege incidentally collect certain information from users of defendants' websites. While the above examples involved TikTok software, others zero in on third-party software from Twitter/X, *see, e.g.*, Compl., *Reick v. Active Internet Techs. LLC*, No. 25STCV10457 (Cal. Super. Ct. L.A. Cnty. Apr. 8, 2025), or from other, lesser-known third parties like Comscore, *see, e.g.*, Compl., *Cantu v. Flipboard, Inc.*, No. 25STCV06169 (Cal. Super. Ct. L.A. Cnty. Mar. 4, 2025). As one court stated, "serial litigants bring[] numerous 'cookie cutter' lawsuits under CIPA against various businesses that operate websites." *Byars*, 656 F. Supp. 3d at 1059. Plaintiffs' firms "appear[] to work with multiple 'tester' plaintiffs to drum up these lawsuits," which "bear strong echoes of serial Americans with Disabilities Act (ADA) litigation." *Id.* at 1060.

As revealing as these publicly filed lawsuits are, they do not tell the whole tale. They are merely the tip of the iceberg. One data aggregator estimates that there are "closer to 5,000" claims

either "filed in private arbitration" or otherwise "resolved without any publicly filed lawsuits." Fisher & Phillips LLP, Tide May Be Turning in Businesses' Favor After Key California Court Decisions in Website Tracking Cases (Feb. 10, 2025), *available at* https://www.fisherphillips.com/en/news-insights/tide-may-be-turning-in-businesses-favor-key-california-court-decisions-website-tracking-cases.html (last visited May 5, 2025). Thus, it is essential that courts review filed claims closely to scrutinize the legal theory supporting these claims, including whether CIPA actually applies to technologies it was never intended to regulate.

The Legislature, too, sees the current wave of modern technology-based CIPA litigation as "abusive." As California Representative Anna Caballero recently explained:

> Meanwhile, these abusive lawsuits do nothing to help consumer privacy. All they want is money; they're not asking for it to be fixed. I've heard directly from many businesses small, medium, and large who have received a shakedown demand letter and opted to settle rather than litigate, due to the cost. Smaller businesses have settled cases for $10,000 to $50,000 to make the case go away because they can't afford the greater cost of litigation and as a result many have struggled financially. A private settlement doesn't create stronger protections for consumers or clearer rules for businesses. It just ends one case.

Hrg. on S.B. 690 Before the Cal. Sen. Pub. Safety Comm. (Apr. 29, 2025) (statement of Rep. Caballero), *available at* https://www.senate.ca.gov/media-archive (beginning at 6:52:52). California State Senator Kelly Seyarto echoed the same sentiment:

> They're not suing to fix it, they're just suing one after another . . . for millions and millions of dollars so that people can make money on that side. And if there's such a problem, then why are they not working to fix it? Suing one after another is not working to fix it, it's just making money. As consumers—I think consumers are sick and tired of that. They're sick and tired of paying for it, they're sick and tired of watching other people get rich off of those schemes, and then, also, sick and tired of watching their smaller businesses fail because these types of suits.

*Id.* (statement of Sen. Seyarto) (beginning at 7:16:44).

There is little debate that the current state of CIPA litigation is problematic. CIPA suits—both filed and threatened—burden businesses of all sizes and provide no discernible benefit to the public. They simply create a windfall for a small number of law firms who file them. Accordingly,

it is crucial that the Court consider the mismatch between Plaintiffs' allegations and the legal theory presented: Plaintiffs' claims manipulate a decades-old law for purposes which it was never intended, thereby providing little utility beyond generating fees for the firms that frequently file these claims. The result is abusive litigation against businesses.

**CONCLUSION**

For the reasons stated above, the Court should closely analyze, and ultimately grant, Defendants' motion to dismiss.

DATED: May 6, 2025

By: */s/ Rebecca B. Durrant*

Rebecca B. Durrant (State Bar No. 350444)
rdurrant@kelleydrye.com
Glenn T. Graham (State Bar No. 338995)
ggraham@kelleydrye.com
KELLEY DRYE & WARREN LLP
888 Prospect Street, Suite 200
La Jolla, CA 92037
Tel.: (212) 808-7551
Fax: (212) 808-7897

*Attorneys for The Retail Litigation Center*